The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Willis. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 25 years old, with a date of birth of 18 November 1968. Plaintiff's socioeconomic background was one of a white, middle-class family, with his mother selling real estate and his father selling insurance. For his education, plaintiff left school in the ninth grade. In his life plaintiff had worked for less than two years. Plaintiff worked for about a year with Carolina Thrift Company in a job baling clothes. He worked for defendant for about one month. Defendant is a temporary employment service, and plaintiff would be assigned jobs on a daily basis.
2. During his childhood, plaintiff suffered severe emotional problems. At about the age of 12 or 13 plaintiff was hospitalized for six months for a psychiatric condition. Plaintiff was diagnosed with an attention disorder. Plaintiff began taking illegal drugs at about the age of 13, and he smoked marijuana on a daily basis from approximately the age of 13 to the age of 22. He left school at the age of 14. At the age of 15, plaintiff left home and began to live "on the streets." For seven years plaintiff was homeless, and he became a drug addict. During this time plaintiff sold drugs to support himself. Plaintiff's favorite drug of choice was hallucinogenics. While on the streets, plaintiff made four suicide attempts, which were more efforts at attention than genuine attempts to kill himself. At about the age of 22 plaintiff began a serious effort to improve himself through Narcotics Anonymous, although he had been in and out of the program for years earlier with several relapses.
3. Plaintiff began working for defendant in April 1992. The general manager of defendant had known plaintiff through Narcotics Anonymous. On 13 May 1992 plaintiff was assigned to work at a brick plant. This was his first day at this particular job. Plaintiff's duties were to work at a conveyor belt which carried bricks. At midday, the conveyor belt stopped working. Plaintiff stood on the conveyor belt which was turned off. The conveyor belt began to run again; and before he could get off, he was pulled by the conveyor belt into a machine, between two rollers. This incident was an admittedly compensable injury by accident. As a result of the accident, plaintiff sustained severe soft tissue injury to his left leg, which included cuts and bruises from his foot to his knee.
4. Plaintiff was taken to the emergency room at Moses Cone Memorial Hospital and was admitted for one night for observation. His primary care was provided by Dr. James Maultsby, an orthopedic surgeon. During his treatment, plaintiff refused narcotics, although he received other pain medication. There were two significant cuts on plaintiff's lower leg. One of the cuts would not heal because movement of the leg kept the wound open. Dr. Maultsby referred plaintiff to Dr. Byron Barber, a plastic surgeon; and Dr. Barber performed a skin graft to close the wound.
5. In August 1992 Dr. Barber referred plaintiff to Dr. Gerald Plovsky, a psychiatrist, for a consultation. Dr. Plovsky conducted a one-time evaluation on 3 August 1992 (three months after the accident). At the time of Dr. Plovsky's evaluation, plaintiff did not suffer from post traumatic stress disorder nor depression, and Dr. Plovsky did not recommend any medication. Plaintiff told Dr. Plovsky that he did not avoid thinking about the accident, but he "wish [ed] that he [plaintiff] had someone to talk more about it." Dr. Plovsky recommended a soft-spoken social worker to talk with plaintiff.
6. On 9 November 1992 (six months after the accident) Dr. Maultsby told plaintiff to start maintaining records of his rehabilitation efforts in a spiral notebook, and Dr. Maultsby instructed plaintiff to attend physical therapy at the YMCA at least five days per week. At first, plaintiff was not compliant with these instructions. Dr. Maultsby stressed to plaintiff "that it was his job" to go to the YMCA at least five days per week.
7. On 3 December 1992 both of the cuts on plaintiff's left leg had completely healed, and Dr. Barber released plaintiff from his care. Three weeks later (24 December 1992) plaintiff was examined by Dr. Maultsby; and at this time, plaintiff walked without a limp when wearing a leg brace; and there was a full range of motion in his ankle with no significant swelling. Dr. Maultsby released plaintiff to begin sedentary work in a sheltered workshop. On 11 January 1993 (eight months after the accident) Dr. Maultsby instructed plaintiff to contact Shelly Thompson with the State Office of Vocational Rehabilitation.
8. Miss Thompson referred plaintiff to Dr. Jake Ricketson, a psychologist with a Ph.D. There were two evaluations by Dr. Ricketson, and the first was performed on 29 January 1993 (about six months after the psychological evaluation by Dr. Plovsky). Plaintiff gave a medical history to Dr. Ricketson which was similar to the medical history given to Dr. Plovsky; however, plaintiff told Dr. Ricketson that he had become depressed and he had had suicidal thoughts since his accident (no mention of suicide to Dr. Plovsky). Dr. Ricketson diagnosed chronic post-traumatic stress disorder (hereinafter "PTSD"). Significantly, it was Dr. Ricketson's opinion that plaintiff's PTSD had begun immediately after the accident; and the condition was not a delayed onset. This opinion of Dr. Ricketson is contradicted by the fact that between the accident and Dr. Ricketson's evaluation plaintiff had been evaluated by Dr. Plovsky; and at the time of Dr. Plovsky's evaluation, plaintiff did not suffer from PTSD.
9. On 25 February 1993 (nine months after the accident) plaintiff was walking without a limp. Dr. Maultsby released plaintiff from his care; and since that time, plaintiff has not used any pain medication. Upon his release from medical care, Dr. Maultsby released plaintiff to return to work with a few restrictions, primarily that he could only occasionally lift more than 30 pounds. On 3 March 1993 defendant wrote a letter to plaintiff offering plaintiff a job within his restrictions. There were jobs available within plaintiff's restrictions which plaintiff could have reasonably obtained if he had contacted defendant, as he was asked to do. Specific jobs which were available included sweeping at construction sites, swatching fabric, and directing traffic at constructions sites. By refusing to contact defendant when offered a job within his restrictions, plaintiff failed to make a reasonable effort under the circumstances to obtain gainful employment. Jobs within plaintiff's restrictions have been continuously available since 3 March 1993; and any inability of plaintiff to be gainfully employed after 3 March 1993 was not caused by the accident of 13 May 1992 and any resulting impairments.
10. On 25 February 1993 plaintiff reached maximum medical improvement from his accident and retained a 5 percent permanent partial impairment to the use of his left leg as a result of the accident.
11. After his release to work to work by Dr. Maultsby, plaintiff sought a second medical opinion from a physician of his choice. Plaintiff chose Dr. Scott Spillman. There were two evaluations by Dr. Spillman. The first examination was on 14 April 1993; and following this examination, Dr. Spillman referred plaintiff for a functional capacity evaluation. During the functional capacity evaluation, plaintiff magnified his symptoms and did not put forth maximum effort; therefore, the undersigned finds limited weight in the results of the evaluation. The second (and last) examination by Dr. Spillman was on 9 June 1993 (13 months after the accident). At this examination plaintiff demonstrated a slight limp; however, while away from the examination, plaintiff had a smooth gait. Dr. Spillman released plaintiff to return to work with no restrictions.
12. During the time that plaintiff was undergoing the evaluation by Dr. Spillman (21 May 1993), plaintiff returned to Dr. Ricketson to conclude his psychiatric evaluation. At this time, plaintiff did not suffer from any organic brain impairment; however, plaintiff did not possess very good academic skills and functioned in the lower percentiles.
13. After Dr. Spillman released plaintiff to return to work with no restrictions, plaintiff was evaluated by Dr. Joel Vogt, psychiatrist, on referral from the State Office of Vocational Rehabilitation. The first examination by Dr. Vogt was on 19 July 1993 (14 months after the accident). At this evaluation plaintiff reported a more dramatic set of symptoms than he had reported to Dr. Plovsky or Dr. Ricketson. For example, plaintiff reported eating problems to Dr. Vogt, but he had told Dr. Plovsky and Dr. Ricketson that he had no eating disorders; plaintiff told Dr. Vogt he had frequent dreams about his accident, but he told Dr. Plovsky the dreams were infrequent; and for the first time plaintiff reported paranoia. One explanation for the difference in the reports to the doctor would be that plaintiff's condition had deteriorated between the ten months since he had seen Dr. Plovsky and the two months since he had seen Dr. Ricketson. However, another explanation for the difference is that plaintiff exaggerated his condition to Dr. Vogt. Supporting that finding that plaintiff exaggerated his condition to Dr. Vogt is the following facts:
1) Two months earlier plaintiff had exaggerated his physical condition during his functional capacity evaluation;
2) Plaintiff did not describe his condition as recent; and
3) Plaintiff's physical condition had improved (Dr. Plovsky examined plaintiff in August 1992 shortly after his surgery; no medical treatment had been given to plaintiff for his leg condition in five months; the doctor of plaintiff's choice had released him three weeks earlier with no restrictions and recommended home exercise and "the best possible level of fitness," but no further medical treatment was recommended).
14. For six weeks Dr. Vogt was plaintiff's primary treating physician. Initially, Dr. Vogt had expected to see plaintiff only six times for his evaluation. However, on 10 August 1993 Dr. Vogt hospitalized plaintiff on an emergency basis because he indicated suicidal tendencies. Plaintiff was discharged from the hospital 30 August 1993, with his condition improved; and he was referred to Guilford County Mental Health Center for follow-up care.
15. From 30 August 1993 through the time of Dr. Lay's deposition (23 February 1994) plaintiff received treatment from the Guilford County Mental Health Center. At this time plaintiff had relapsed in his drug recovery, and was again smoking marijuana. During this treatment, plaintiff did not complain of any physical problems with his left leg; and where there are notations regarding other medical problems and concerns (other than his mental problems) "none known" had been written in the space. Plaintiff's behavior at the Mental Health Center was described as "manipulative." A therapist provided treatment for plaintiff under the supervision of Dr. Randall Lay. On 20 September 1993 Dr. Lay met with plaintiff and his therapist, and Dr. Lay recommended that plaintiff attempt to find a job. Plaintiff replied, "I think I just want to live on social security for a while and go back to school and we'll see how things go." Following 23 February 1994 plaintiff's treatment at the Mental Health Center was expected to continue.
16. In October 1993 plaintiff was admitted to John Umstead Hospital. In the hospital records no physical problems with plaintiff's leg are noted, and plaintiff is again described as "manipulative." Significantly, there is no diagnosis of PTSD, as the "Axis 1" diagnosis is "R/O Bipolar d/o, depressed."
17. The undersigned finds plaintiff's testimony was not credible. This finding is based on the following: plaintiff's demeanor at the hearing; the fact that plaintiff has exaggerated his symptoms; inconsistencies in plaintiff's reports to his doctors and his testimony; the fact that plaintiff had indicated a desire to stay on disability, rather than find a job; and plaintiff had been convicted of the crime of receiving stolen property within ten years of the date of the hearing.
18. The undersigned finds that plaintiff does not suffer from PTSD and that any mental condition he may have is not the natural and probable consequence of the accident of 13 May 1992. Any treatment plaintiff has received for his psychological problems was not made necessary as a result of the accident of 13 May 1992
19. Plaintiff was paid temporary total disability compensation in the amount of $113.34 for the period of time from 13 May 1992 through 3 August 1993.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As a result of his injury by accident of 13 May 1992, plaintiff is entitled to temporary total disability compensation in the amount of $113.34 for the period of time from 13 May 1992 through 3 March 1993. As said amount has already been paid, plaintiff is not entitled to any further temporary total disability compensation. N.C.G.S. § 97-29.
2. As a result of his injury by accident of 13 May 1992, plaintiff is not entitled to temporary total disability compensation from 4 March 1993 through 3 August 1993 (for 21 and 5/7's weeks). The temporary total disability compensation paid to plaintiff during this period of time was not due and payable when made; and therefore, defendants are entitled to a credit for said amounts. N.C.G.S. § 97-42.
3. As a result of the injury by accident of 13 May 1992, plaintiff is entitled to permanent partial disability compensation in the amount of $113.34 per week for ten weeks due to the 5 percent permanent partial impairment to the use of his left leg. Because defendant has overpaid temporary total disability compensation in an amount in excess of the permanent partial disability compensation due, plaintiff is not entitled to any permanent partial disability compensation. N.C.G.S. § 97-31.
4. Plaintiff is entitled to the payment of all medical treatment incurred, or to be incurred, as a result of the injury by accident of 13 May 1992. Plaintiff is not entitled to the payment of any medical treatment provided for his alleged psychological condition. N.C.G.S. § 97-25.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
1. Plaintiff's claim for additional temporary total disability compensation must be, and the same is heionalreby, DENIED.
2. Plaintiff's claim for any permanent partial disability compensation must be, and the same is hereby, DENIED.
3. Defendants shall pay all medical expenses incurred, or to be incurred, by plaintiff as a result of his injury by accident of 13 May 1992. Defendants are not responsible for any treatment plaintiff received for his alleged psychological condition.
4. Each side shall pay its own costs, except that defendants shall pay an expert witness fee as provided by previous order, and an expert witness fee in the amount of $350.00 to Dr. Lay, $275.00 to Dr. Vogt, and $200.00 to Dr. Ricketson.
 S/ ________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ________________ THOMAS J. BOLCH COMMISSIONER
S/ ________________ COY M. VANCE COMMISSIONER